COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

§

JANSSEN PHARMACEUTICA, INC.,                     No. 08-06-00265-CV

§

       Appellant,                                 Appeal from

§

v.                                       168th District Court

§

MELISSA M. MARTINEZ,                of El Paso County, Texas

§

       Appellee.                             (TC # 2004-2737)

§

## CORRECTED OPINION

Janssen Pharmeceutica, Inc. appeals a jury verdict in favor of Melissa M. Martinez on employment discrimination claims. Because the evidence at trial was not legally sufficient to support Martinez's claims, we reverse and render judgment in favor of Janssen.

## FACTUAL SUMMARY

Martinez was employed by Janssen as a pharmaceutical sales representative for certain medications aimed at the central nervous system. She was hired in May 2002, after interviewing with Jim Ball, Janssen's District Manager for the South Central Region, and Rob Kraner, Janssen's Business Director for the South Central region. Ball reported to Kraner.

Martinez was to call on physicians, to sell the products she was promoting, and to enter calls into Janssen's computer system, known as Siebel. Janssen's policy required that sales representatives enter a summary of sales calls to physicians into the Siebel system immediately following the call. Calls are classified as reportable or nonreportable. Reportable calls require face-to-face interaction with the customer about the product. Janssen expected that eight reportable sales calls would be made each work day. Janssen's sales representatives were provided with a company

car and company fuel card. Each time gas was purchased, a representative was required to enter the odometer reading of the company car. Mileage must also be entered in expense reports.

When Martinez began working for Janssen, Jim Ball was her supervisor. Her territory included El Paso and portions of West Texas. After a realignment of sales districts in December 2002, Martinez began reporting to Shannon Groppenbacher, a District Manager based in Phoenix, who in turn reported to Rob Kraner until December 2004. After the realignment, Martinez's territory covered El Paso and southern New Mexico, including the cities of Las Cruces, Alamogordo, Carlsbad, Hobbs, and Roswell. Of all the employees whom Groppenbacher supervised, Martinez was the only Hispanic.

In December 2002, Groppenbacher invited Martinez to Arizona so they could become acquainted and so that Martinez could meet the other sales representatives in the new district. Groppenbacher also traveled to El Paso in January 2003 to meet with Martinez and to coach her on her sales performance. Groppenbacher had positive comments about the job Martinez was doing.

Martinez learned she was pregnant in January 2003 and she informed Groppenbacher in February. Due to complications, Martinez took a two-week leave of absence and Groppenbacher helped her obtain leave. In April, Groppenbacher received a complaint from Dr. Fizbein, a physician in Las Cruces, that he was not receiving good service from Martinez and that it was difficult for him to obtain samples. Groppenbacher also received calls from other physicians in southern New Mexico who were seeking a representative. These complaints prompted Groppenbacher to report the matter to Kraner. Groppenbacher was instructed to investigate, either by Kraner or Grayce Hubbard, an employee in Janssen's human resources department. Groppenbacher and Kraner obtained fuel log reports for Martinez, the log of her call entries into the Siebel system, her expense

reports, and mileage information from MapQuest.com. Upon comparing the dates that Martinez made reportable calls, the dates and locations that she refueled her car using the company fuel card, and the mileage required to travel from El Paso for the calls, Groppenbacher and Kraner concluded that Martinez could not have made all of the sales calls that she reported. Groppenbacher noticed that the call entries made on January 30, 2003 were for visits in Alamogordo, Roswell, Carlsbad, and Las Cruces. Groppenbacher determined that the drive from El Paso to visit these cities was approximately 470 miles. Martinez's fuel reports indicated that she had refueled in New Mexico on the afternoon of January 30. Although Groppenbacher conceded that it might have been possible to travel 470 miles on one tank of gas, she discovered that Martinez had not used the fuel card again until February 24. But Martinez had entered calls into the system for office visits in the El Paso and Las Cruces area on January 31, February 4, February 5, and February 7. Groppenbacher decided that it would have been impossible for Martinez to travel to all of the reported locations and only refuel the vehicle once. Groppenbacher also noticed a January 30 call report to Dr. Pezzarossi in Roswell, New Mexico. When she called the office, Groppenbacher was told by the receptionist that Dr. Pezzarossi had moved to Albuquerque and had not practiced in Roswell since the summer of 2002. Martinez also entered a call for Pezzarossi in Roswell on March 24. Martinez reported a call to the office of Dr. Gervais on the same date and later admitted to Groppenbacher that she had not made the call. Martinez had refueled her company vehicle on March 20, and reported calls on March 21 in El Paso and Las Cruces. Martinez next reported calls for March 24 (including calls to Dr. Pezzarossi and Dr. Gervais) for locations in Alamogordo and Roswell. Groppenbacher determined that the approximate round trip mileage was 460 miles. Martinez reported additional calls in El Paso and Las Cruces on March 25. According to the fuel reports, Martinez did not refuel

her vehicle until March 25 at 9:10 p.m.

Groppenbacher also contacted physicians in the area. She called the office of Dr. Danckzk about Martinez's reported visit on February 28. The nurse told Groppenbacher that she had worked in the office Monday through Friday each day for the preceding seven months and did not recall seeing a representative during that time. Another nurse who had worked there for a longer period of time, did not recall seeing a representative either.

Groppenbacher also found that the calls that Martinez had reported for February 28 would have included Hobbs and Carlsbad. Groppenbacher calculated that the round-trip mileage to these cities from El Paso was approximately 460 miles. Martinez refueled her vehicle on February 24, but did not refuel again until March 4. She had reported calls for March 3 and 4 in El Paso and Las Cruces. Again Groppenbacher concluded it would not have been possible for Martinez to make all of these visits on a single tank of gas.

Information concerning the date a call report was entered into the Siebel computer system was available from Janssen's home office, but the data could not be viewed by sales representatives. Groppenbacher obtained that information and determined that Martinez had input certain call reports weeks after the date of the call. Groppenbacher and Kraner concluded that Martinez had falsely entered calls for doctors that she had not seen.

Janssen had a four-step disciplinary procedure in place. The first step was a verbal warning. The next step consisted of a written statement describing the incident and warning the employee that he or she needed improvement. The third step was a final written warning. The last step, known as a Group I violation, was termination. Groppenbacher communicated her findings to Janssen's human resources department, which suggested that Martinez had committed Group I violations by

entering calls that she had not made.

Groppenbacher then asked Martinez to fly to Phoenix on April 30, 2003, for a meeting to discuss territory management issues. She did not ask Martinez about her call entries prior to the meeting. According to Groppenbacher, the purpose of the meeting was to get Martinez's side of the story. She did not ask Martinez to bring any paperwork or backup data. Groppenbacher denied that termination had been decided upon prior to the meeting. She and Kraner met with Martinez in Phoenix for some two to three hours. They informed her that she had committed a Group I violation and that they would be back in touch with her. According to Groppenbacher, Martinez admitted to making a "mistake," but she did not admit that she falsified documents. Kraner noted that Martinez admitted she had not seen Dr. Gervais on March 24; that she entered a call out of frustration of not having seen another doctor on March 24; that she fabricated having seen Dr. Pezzarossi in Roswell; that she did not see Dr. Fizbein as reported on March 26; and that she did not see a doctor in Hobbs on February 28 as reported. According to Kraner, Martinez admitted that she entered calls on physicians she did not see. Kraner acknowledged that Martinez did not specifically admit to falsifying documents, but only to inaccuracies. After the meeting, Groppenbacher discussed the issue with Kraner and Hubbard and decided to terminate Martinez. Kraner contacted Martinez and offered to allow her to resign in lieu of termination. When Martinez refused, Kraner terminated her employment for violation of Janssen's Group I work rules. Groppenbacher then hired Susan Blake, a Caucasian female, to replace Martinez. Martinez sent a letter to Janssen advising that she was aware of other employees who were not terminated in similar circumstances, and that she believed that she had not received equal treatment because of her pregnancy and her ethnicity.

Marc Hood, a Caucasian male, was a sales representative for Janssen in the same region as

Martinez. He received a formal warning on June 27, 2002 for failing to enter his calls to physicians into Janssen's Siebel system. Groppenbacher was not the decision maker but she learned of Hood's discipline after Martinez filed suit. Groppenbacher testified that Hood's violations were different.

After Martinez was terminated, Groppenbacher supervised a sales representative named C.S. C.S. held the same position that Martinez had held, but she was located in Phoenix. C.S. was a Caucasian female, and was not pregnant when Groppenbacher hired her. Groppenbacher conducted an investigation of C.S. and disciplined her in May of 2005 for violation of a Group I work rule. C.S. reported seeing certain doctors when, in fact, she had not. She received a formal written warning for her conduct but was not terminated. According to Groppenbacher, C.S.'s violation had been different, but she did not explain how, other than to say that Janssen's human resources department determined that C.S.'s actions had not been deceitful. Groppenbacher claimed that she had administered the discipline to C.S. but that Janssen's human resources department had decided on the appropriate discipline. Groppenbacher explained that she went to the human resources department in C.S.'s case because of the litigation involving Martinez. Had she been the decision maker, Groppenbacher would have fired C.S. "to be fair and equal to everybody."

Kraner testified that he was not aware of any employees who had been disciplined for similar conduct. He had been involved in the discipline of Marc Hood and Doug Shannon for failing to report required daily activity reports. Hood and Shannon were both sales representatives and both were Caucasian males. They received warning letters for failing to enter their calls on a timely basis, but neither was terminated. Kraner testified that the investigations of Hood and Shannon did not reveal they had falsified documents. Kraner was not involved in the discipline of C.S. because she was not in his district. Kraner believed that Hood and Shannon's conduct differed from Martinez's

-6-

because they had seen doctors but failed to timely report the visits. Hood's violations constituted a Group II work rule violation which provides for corrective action. Martinez's actions constituted violations of Group I work rules pertaining to falsification of documents and dishonesty.

Martinez testified that Groppenbacher called her about the April 30 meeting in Phoenix to discuss territory issues. She was not specifically told what would be discussed. (She described the meeting as a "Spanish inquisition" in which she was asked question after question without a break.) Martinez she did not have any paperwork or any other way to prove that she had not the things of which she was accused. She felt that Kraner and Groppenbacher were nit-picking for any faults in her work and that they were looking for a reason to pin something on her. After having time to think about the situation on the flight home, she decided to write the letter to Groppenbacher and take responsibility for any inaccuracies in her reports. Martinez believed that she only admitted to inaccuracies, and not to falsifying documents or intentionally misreporting information. Martinez hoped that by writing the letter, she would have an opportunity to present some documentation to rebut the accusations.

As for some of the specific allegations against her, Martinez claimed she had been confused when she entered the call reports for Dr. Gervais and Dr. Pezzarossi because she visited the office in Roswell for the first time in January of 2003 and believed that the two doctors shared an office. Martinez had met so many people that she "didn't quite know who everyone was." She thought she had met Dr. Pezzarossi and, as a result, entered his name in the system incorrectly. As for her trip to Roswell on January 30, she did not take the company car, but took her personal car because she was staying with friends in Dell City, Texas, and felt it would have been inappropriate to take the company car on a personal trip.

Martinez was five months pregnant when she was terminated. On May 5, 2003, she e-mailed Ed Hill, the head of Janssen's human resources department, and transmitted her letter to Groppenbacher. In the e-mail, Martinez stated that she was aware of other employees in similar circumstances who had not been fired, but were given formal warnings. Martinez alleged that she was not treated equally because of her pregnancy and her ethnicity.

The jury found that Martinez's pregnancy and her national origin were motivating factors in Janssen's decision to terminate her. She was awarded damages of $690,000 for back pay, front pay, and compensatory damages. The amount was reduced in the final judgment to $74,999 in accordance with Martinez's stipulation and pleadings.

**LEGAL INSUFFICIENCY**

*Standard of Review*

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). When the party with the burden of proof suffers an unfavorable finding, the point of error should be that the fact or issue was established as "a matter of law." *Id*. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id*. A legal sufficiency or "no evidence" challenge will be sustained on appeal if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex.App.--El Paso 2006, no pet.), *citing City of Keller*

*v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

In reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could not. *City of Keller*, 168 S.W.3d at 807. We are to consider the evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *Id*. at 822. However, if the evidence allows of only one inference, the trier of fact may not disregard it. *Id*. When a no evidence point of error rests on the competency of the evidence, we may not disregard contrary evidence showing it to be incompetent. *Id*. at 812.

*The Statute*

The Texas Commission on Human Rights Act (the "Act") prohibits discrimination in employment based on "race, color, disability, religion, sex, national origin, or age." TEX.LABOR CODE ANN. § 21.051 (Vernon 2006). Discrimination on the basis of sex includes pregnancy. TEX.LABOR CODE ANN. § 21.106(a). One express purpose of the Act is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." TEX.LABOR CODE ANN. § 21.001(1); *NME Hospitals, Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). "Consequently, when reviewing an issue brought under Chapter 21, we may look not only to cases involving the state statute, but also to cases interpreting the analogous federal provisions." *El Paso County v. Navarrete*, 194 S.W.3d 677, 683 (Tex.App.--El Paso 2006, pet. denied).

In discrimination cases based upon circumstantial evidence, the plaintiff must first establish a *prima facie* case that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the job she held; and (4) she was replaced by someone not within her protected class. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Bowen v. El Paso Electric Co.*, 49 S.W.3d 902, 908 (Tex.App.--El Paso 2001, pet. denied). The burden of production then shifts to the employer to produce evidence that the plaintiff was terminated for a legitimate, nondiscriminatory reason. This burden is one of production only, not persuasion, involving no credibility assessment. *Reeves*, 120 S.Ct. at 2106; *Bowen*, 49 S.W.3d at 909. Once the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action, the plaintiff may prove discrimination by showing that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Reeves*, 120 S.Ct. at 2106; *Bowen*, 49 S.W.3d at 909. As the Supreme Court explained in *Reeves*, "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves*, 120 S.Ct. at 2109.

To prevail on a claim of discrimination based on disparate treatment, a party must prove that: (1) she was a member of a class protected by the Act; (2) she was qualified for her positions; (3) she was terminated; and (4) she was treated less favorably than similarly situated members of the opposing class. *See Ysleta Ind. School Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005); *see also Thompson v. Exxon Mobil Corp.*, 344 F.Supp.2d 971, 980 (E.D. Tex. 2004). As the Texas Supreme Court explained in *Ysleta*, "[e]mployees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct. To prove discrimination based on disparate discipline, the disciplined and undisciplined employees' misconduct must be of 'comparable seriousness.'" *Id*. at 917 [citations omitted]. Although precise equivalence in culpability is not the ultimate question, a plaintiff must usually show that the misconduct for which she was discharged was nearly identical to the conduct engaged in by an

employee whom the company retained. *Id*. at 917-18.

*Disparate Treatment*

Janssen challenges the jury's verdict on the basis that Martinez sought to prove her case by showing that she was treated differently than other similarly situated employees, and that there was insufficient evidence to support discrimination on this basis. Janssen contends that this was Martinez's sole theory; she did not attempt to prove that Janssen's reason for discharge was false and therefore could be inferred as a pretext for discrimination. Specifically, Janssen argues that Hood, Shannon, and C.S. were not similarly situated employees. As to Hood and Shannon, Janssen contends they were disciplined with warning letters for failing to report sales calls they made, whereas Martinez was fired for entering reports for calls that she never made. Martinez responds that the evidence permitted the jury to find that she did not falsify records, but merely made errors in her reporting.

At trial, Janssen employees testified that Hood and Shannon failed to enter calls to physicians into the Siebel computer system. Groppenbacher testified that Hood's violations were different from Martinez's. Kraner testified that he had been involved in the discipline of two employees, Marc Hood and Doug Shannon, for failing to report required daily activity reports. Kraner testified that investigations of Hood and Shannon did not show that they had falsified documents.

There was no evidence offered at trial to show that either Hood or Shannon entered inaccurate call reports. Rather, Hood and Shannon were reprimanded for failing to timely enter reports of their calls. As such, Martinez did not show that her conduct was similar. As the Texas Supreme Court explained in *Ysleta*, the misconduct at issue must be of comparable seriousness, and a plaintiff must usually show that the misconduct for which she was discharged was nearly identical

-11-

to the conduct engaged in by an employee whom the company retained. *Id*. at 917-18.

Janssen next contends that there was no evidence that C.S. was similarly situated. First, it argues that C.S.'s case involved different decision makers. At trial, the evidence showed that Groppenbacher made the decision concerning Martinez, and that Kraner and Hubbard approved it. Groppenbacher testified that she was not the decision maker with regard to C.S., but only delivered the discipline. Groppenbacher was asked by counsel for Martinez, apparently referring to a Groppenbacher's deposition, if she remembered when he asked her who disciplined C.S. Groppenbacher responded, "I actually told you that I disciplined her." Thereafter, counsel for Martinez attempted to impeach Groppenbacher's testimony with her deposition testimony. The evidence is conflicting on this issue, and contrary to Janssen's arguments on appeal, we cannot say that the evidence conclusively established that Groppenbacher was not the decision maker with respect to C.S.

Janssen's second argument is that Martinez was not similarly situated to C.S. because C.S. was disciplined two years after Martinez was terminated. It is undisputed that Martinez was terminated in early May 2003 and that C.S. was disciplined in May 2005. Janssen relies on *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386 (Tex. 2005). There, a former employee sued her employer for retaliatory discharge for allegedly firing her because she had filed a workers' compensation claim. The plaintiff went on leave for injuries sustained in the workplace and remained on leave for more than a year. *Id*. at 386. She was terminated pursuant to the employer's policy which provided for a maximum leave of one year. *Id*. at 387. The plaintiff presented evidence that another employee went on leave for three years and was not terminated, and argued that this demonstrated that the policy was not uniformly enforced. *Id*. at 388. The Texas Supreme

Court held that such evidence amounted to no more than a scintilla, and noted that "[e]ven viewed in the light most favorable to the jury's finding, the evidence shows, at most, that three years after Hernandez was terminated, Haggar failed to officially discharge one employee who had been on leave for over a year." *Id*. at 389.

Martinez responds that there is no requirement that an employment decision be made within any particular time frame in order to be relevant. She relies on *Freeman v. Madison Metropolitan School Dist.*, 231 F.3d 374 (7th Cir. 2000). In *Freeman*, the Seventh Circuit reversed a district court's directed verdict against an employee on his race discrimination claim. The plaintiff was injured on the job in 1992 and did not return to work until 1995. *Id*. at 376. The plaintiff alleged that the school district's refusal to return him to work on a modified basis was based on race discrimination because the district's policy was to provide such modifications and the policy was followed for Anglo employees. After concluding that the directed verdict was improper, the court addressed the exclusion of evidence of two injured Anglo employees because their injury occurred ten months after the last alleged discriminatory act against the plaintiff. The Seventh Circuit explained:

> It is the rare case indeed in which there is a nearly exact temporal overlap between the allegedly discriminatory conduct and the conduct regarding similarly situated individuals. The last date of the allegedly discriminatory conduct is not a bright line beyond which the conduct of the employer is no longer relevant in a discrimination case. Otherwise, clearly relevant evidence would be arbitrarily excluded; for instance, a plaintiff in a race discrimination case would then be precluded from producing evidence that the week after he was fired, a white employee escaped discipline for the exact same conduct. The focus must remain on whether the evidence is relevant to demonstrate that discrimination played a role in the decision, and that determination is not served by a bright-line temporal restriction. Here, the proffered testimony involved conduct by the employer approximately ten months after the last challenged act regarding Freeman.

-13-

*Id*. at 382. We agree that there is no bright-line rule as to how much time can pass between the decisions before they are no longer appropriate for comparison. However, C.S. was disciplined two years after Martinez was terminated, and almost a year after Martinez filed this lawsuit. To be considered similarly situated, the employees' circumstances must be "comparable in all material respects." *Ysleta*, 177 S.W.3d at 917. Given the passage of time and the pendency of this litigation, Martinez's and C.S.'s circumstances were not comparable. As such, C.S.'s discipline was not relevant to Martinez's termination.

*Pretext*

Janssen also argues that to the extent Martinez sought to prove discrimination by showing that its proferred reason for termination was false and thus a pretext for discrimination, Martinez failed to present any evidence in this regard. Martinez responds that, based on the jury charge, the jury was permitted to determine that Janssen's reason for Martinez's termination was false and to infer that discrimination motivated the decision.

The jury was asked whether Martinez's pregnancy was a motivating factor in Janssen's decision to terminate her. The jury was also asked whether Martinez's national origin was a motivating factor in Janssen's decision to terminate her. Among other things, the jury was instructed, on both the question concerning pregnancy and national origin, that:

A 'motivating factor' in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

In order to show that an employer's decision was motivated by her pregnancy, an employee need not show that her pregnancy was the sole cause or even a substantial cause of the employer's action. The employee need only show that her pregnancy was a motivating factor in the employer's action, even if other reasons existed.

Evidence that an employer's stated reason for an employment action is false is ordinarily sufficient to permit you to find that the employer was actually motivated by discrimination.[1]

Although Janssen objected to the instruction at trial, Janssen does not challenge it on appeal. It concedes in its reply brief that it is not seeking a new trial based on the falsity instruction. Nevertheless, Janssen argues in its reply brief that it preserved error on the charge, and argues that the charge is an incorrect statement of the law with regard to proving pretext. According to Janssen, because it preserved error on the issue, this court must analyze Janssen's legal sufficiency challenge according to an appropriate statement of the law. When reviewing a sufficiency of the evidence challenge, an appellate court is to rule on the question and instruction actually submitted to the jury, rather than the instruction that should have been submitted to the jury, if the defect was never brought to the court's attention. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Although Janssen objected to the jury charge at trial, it has chosen not to challenge the jury charge on appeal. For this reason, we will review Janssen's legal sufficiency challenge according to the charge provided to the jury.

The evidence showed that Janssen's reason for Martinez's termination was that Martinez falsified her call reports by reporting calls that she did not make. Martinez testified that she admitted

---

[1] With regard to the question of discrimination based on national origin, the charge contained an identical instruction, with the exception the term "pregnancy" was used in place of the term "national origin."

-15-

to inaccuracies in her reports, but never admitted to falsifying documents or intentionally misreporting information to Janssen. Martinez testified that, at the April 30 meeting, she did not have any paperwork or any way to justify that she had not done any of the things that she was accused of doing. Martinez testified that she asked for the opportunity to do so. She testified that she had brought her paperwork to the meeting, she would have had sample receipt forms to show that she was actually in the locations at the times she specified. After having time to think about the situation on the flight home, she decided to write the letter to Groppenbacher and take responsibility for any inaccuracies in her reports. Martinez stated that she only admitted in the letter to inaccuracies, and not to falsifying documents or intentionally misreporting information. Martinez noted in the letter that she was "glad that [she] was able to settle some of the issues you had concerning territory management, for instance: the posting of unsubmitted calls; verifying certain calls had been made but not show up in your reports . . . ."

Notably missing from Martinez's testimony is any direct assertion that she was never dishonest concerning her call reports or that she did not falsify her reports. Instead, the evidence proffered by Martinez to prove that Janssen's stated reason for her termination was false was that she never admitted to any dishonesty or misrepresentations, that she was not told in advance the reason for the April 30 meeting, but had she known of its purpose, she would have offered documents to show she had visited the offices. Martinez did not produce any of the evidence of the documents at trial that she said she would have used at the meeting.

Regarding the reported calls to Dr. Pezzarossi, Martinez explained on direct examination that she believed Drs. Pezzarossi and Gervais had an office together, and that she reported that she dropped off samples to both Drs. Pezzarossi and Gervais, because "[u]sually one physician can sign

for samples for the office." On cross-examination, she explained that she had met so many people on her visit there that she "didn't quite know who everyone was. I met quite a few people and I entered his name incorrectly. His name was still in the Siebel system that he was there." She admitted that she did not speak to Pezzarossi, and that it was obvious that she only spoke to Dr. Gervais. Finally, with regard to discrepancies in the fuel logs, Martinez testified that for one of her trips to Roswell at the end of January, she did not take the company car, but took her personal car because she was going to stay with friends in Dell City. Martinez did not offer any explanation as to the other trips that Janssen believed showed discrepancies. Nor did Martinez indicate whether she informed Groppenbacher or Kraner of the foregoing at the April 30 meeting, or at any other time. Other than her explanation concerning use of her own vehicle on one of her trips to Roswell, Martinez's evidence simply does not address how or why Janssen's stated reason for her termination was false, only that she never admitted dishonesty and that she would have explained herself if given the chance. This evidence amounts to no more than a scintilla that Janssen was motivated by discrimination in terminating her employment. Accordingly, we sustain Janssen's issue. We reverse and render judgment in favor of Janssen.

February 19, 2009          /s/ Ann Crawford McClure
                                     ANN CRAWFORD McCLURE, Justice

Before McClure, J., Barajas, C.J. (Ret.), and Gomez, J.
Barajas, C.J. (Ret.), sitting by assignment
Gomez, J., sitting by assignment