

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LABOE LABRADO, | § | No. 08-23-00271-CV |
| Appellant, | § | Appeal from the |
| v. | § | 448th District Court |
| AURORA LEGARRETA, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2016DCV0016) |

## **O P I N I O N**

Appellee Aurora Legarreta (Legarreta) was injured on the job while employed at a day care center in El Paso. Seeking compensation for her injuries, she sued Appellant Laboe Labrado and several companies he owned or operated, including El Paso Bright Beginnings, LLC, doing business as First to Read (Bright Beginnings), as her employer. A jury found that Bright Beginnings, which was in bankruptcy, was her employer and that Labrado, who was the sole member and manager of Bright Beginnings, could be held personally responsible for Bright Beginnings's obligations under a corporate-veil piercing theory. The jury awarded Legarreta damages, and trial court entered a judgment against both defendants for $163,680.01, which included attorneys' fees and prejudgment interest. Only Labrado appealed. The sole issue before us is whether the record contains sufficient evidence to support the jury's determination that Labrado could be held personally responsible for Legarreta's injuries under a corporate veil-

piercing theory. We affirm the jury's verdict and trial court's judgment awarding damages against Labrado.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Labrado family's day care operations

Labrado was the sole member and manager of Bright Beginnings, which he created in 2002 to operate a day care center at 601 Resler Drive in west El Paso. His mother, Claudia Labrado, had her own day care center in east El Paso, which was operated through Dimensions in Education, Inc., (Dimensions), a corporation in which Labrado had an interest and was an authorized signatory. Because of credit issues, Dimensions, which had been in business longer, obtained a loan to construct a building at 601 Resler Drive to be used for the day care center. By warranty deed dated April 21, 2015, Dimensions transferred the building to 601 Resler, LLC, which Labrado formed and solely managed, effective January 9, 2015, for the sole purpose of holding the asset. At some point, Labrado subsequently formed Three R's School, LLC (Three R's), of which he was also the sole member and manager, to operate another day care center in east El Paso.

### B. Legarreta's workplace injury

Legarreta began working at the day care center located at 601 Resler Drive, which at the time was known as "First to Read," in November 2014. It is undisputed that she was working at the center on February 20, 2015, when one of her students kicked her leg as she stood on a chair in a classroom to hang a decoration, causing her to fall and fracture her wrist. She underwent surgery, which involved placing plates and screws in her wrist, and she was required to do physical therapy for a year. At trial, Legarreta testified she has ongoing pain and no longer has full use of her hand, which has affected her family life and employment prospects.

2

### C. Legarreta's two state court lawsuits

Legarreta filed her first lawsuit seeking compensation for her injuries on January 5, 2016, in El Paso County Court at Law No. 6, docketed as 2016DCV0016. Legarreta named Labrado, his three LLCs, and Dimensions as defendants. The lawsuit alleged that the defendants—without specifying which one—were her employers and that they had denied her a safe workplace as required by the Texas Labor Code.[1] She sought damages for her injuries, including medical expenses and past and future pain and suffering. The various defendants answered Legarreta's petition, filing general denials.

As explained in more detail below, while that case was pending, Bright Beginnings filed for bankruptcy in April 2018. On June 29, 2018, Legarreta filed a second petition, omitting Bright Beginnings as a defendant, and instead only naming Dimensions, 601 Resler, LLC, and Labrado as defendants, in County Court at Law. No. 3, docketed as 2018DCV2381. In her second petition, which she labeled as a "Suit for Fraudulent Transfer," Legarreta alleged that Dimensions was her employer and that 62 days after she suffered her injuries, Dimensions fraudulently transferred the building located at 601 Resler Drive where she worked to 601 Resler, LLC for less than its reasonable value, rendering Dimensions insolvent and unable to pay for her injuries.[2] The petition

---

[1] Section 411.103 of the Texas Labor Code provides:

> Each employer shall: (1) provide and maintain employment and a place of employment that is reasonably safe and healthful for employees; (2) install, maintain, and use methods, processes, devices, and safeguards, including methods of sanitation and hygiene, that are reasonably necessary to protect the life, health, and safety of the employer's employees; and (3) take all other actions reasonably necessary to make the employment and place of employment safe.

Tex. Lab. Code Ann. § 411.103.

[2] Legarreta's claim that Dimensions was her employer, or at least one of her employers, was based on evidence that Dimensions had been incorporated as "Dimensions in Education, Inc., d/b/a First to Read"—the name of the day care center on Resler Drive where she worked, while the articles of incorporation for Bright Beginnings stated it intended to do business as "Bright Beginnings Academic Center." However, as discussed below, the jury rejected that claim and instead found that Bright Beginnings was her only employer.

alleged that the transfer violated the Texas Uniform Fraudulent Transfers Act (TUFTA) found in Chapter 24 of the Texas Business and Commerce Code, maintaining the transfer was done "with actual intent to hinder, delay or defeat recovery" of her previously filed claim for personal injuries in Cause No. 2016DCV0016.

Legarreta sought an order setting aside the conveyance and to enjoin all defendants from further transfers of Dimensions's assets; a lien on the property; exemplary damages; and attorneys' fees.

### D.  Bright Beginnings's bankruptcy petition

After Bright Beginnings filed its voluntary petition for bankruptcy on April 27, 2018, both of Legarreta's lawsuits were automatically stayed. In its bankruptcy petition, Bright Beginnings listed Legarreta as a creditor based on the lawsuit she had filed against it but valued her claim at a dollar.

In its petition, Bright Beginnings claimed it had a total of $11,234.77 in assets, including (1) $5,430.27 in a Chase checking account; (2) $3,429.50 in a credit union checking account; (3) accounts receivable of $9,450, which Bright Beginnings claimed were "doubtful or uncollectable," resulting in zero value; and (4) office furniture, fixtures, and equipment totaling $2,375. Bright Beginnings claimed to have no investments, no other inventory, no real property, and no other assets.

The petition stated that Bright Beginnings had no creditors with secured claims but listed the creditors with priority and nonpriority unsecured claims to whom it owed a total of $329,237.46. Listed creditors with priority unsecured claims were Labrado's then-girlfriend, Ana Melissa Dozal ($5,098); the City of El Paso ($0); and the IRS Insolvency Office ($3,427.18). Among several others, listed creditors with nonpriority unsecured claims included: Labrado

($59,151.12); Three R's ($216,503.52); attorney David Leffman ($22,350); Legarreta ($1); 601 Resler, LLC (unknown amount); and El Paso County Tax Assessor/Collector (unknown amount). It further listed an unexpired lease with 601 Resler, LLC for $5,000 per month in rent to end on January 9, 2025. The petition alleged that "[a]fter any administrative expenses are paid, no funds will be available for distribution to unsecured creditors."

### E. The Bankruptcy Trustee's complaint for avoidance of transfers

On April 27, 2020, the Bankruptcy Trustee filed a complaint for avoidance of three transfers Bright Beginnings allegedly made to Labrado and Three R's within the year prior to the bankruptcy filing. The complaint alleged that the following transfers violated both TUFTA[3] and the Bankruptcy Code because they were made with the actual intent to hinder, delay, or defraud the claims of Bright Beginnings's creditors, including Legarreta:

- "Direct transfers" from Bright Beginnings to Labrado, starting 4/27/2017, with nine transfers approximately twice a month for $2,500 through 12/20/2017, and then eight transfers of $1,500 approximately twice monthly through 4/13/2018, for a total of $33,000, ending the week before Bright Beginnings declared bankruptcy.

- "Indirect transfers" from Bright Beginnings to Labrado, involving payments Bright Beginnings made to pay debts owed on Labrado's personal credit card account totaling $30,000, beginning on 2/13/2018 and ending on 4/16/2018, the week before Bright Beginnings declared bankruptcy.

---

[3] The purpose of TUFTA is to "prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). "Under TUFTA, a transfer made with actual or constructive intent to defraud any creditor may be avoided to the extent necessary to satisfy the creditor's claims: (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id.* In determining whether an individual acted with actual intent, TUFTA lists 11 nonexclusive indicia to consider, "including transfer to an insider, concealment of the transfer, debtor-retained control of the property after the transfer, debtor-involved litigation prior to transfer, and failure to obtain consideration reasonably equivalent to the value of the asset transferred." *Id.* "Evidence of a single 'badge of fraud' does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud." *Id.* at 566–567.

5

- A series of transfers that Bright Beginnings made to Three R's School LLC, which was owned and managed by Labrado, totaling $132,904.52, beginning on May 1, 2017 and continuing through 4/18/2018, the week before Bright Beginnings declared bankruptcy.

As an indicium of fraud, the Trustee alleged the transfers were made after Legarreta sustained injuries while she "was employed by [Bright Beginnings] and for which [Bright Beginnings] lacked insurance." The Trustee asked the bankruptcy court to avoid the transfers and "award judgment to Trustee in the amount of the value of such avoided Transfers from the Defendant not less than as follows: a. Laboe Labrado—$198,904.52[;] b. Three R's School, LLC—$132,904.52[;] c. Chase-$30,000."

In response, Labrado first acknowledged that Bright Beginnings had made transfers to him in the total amount of $33,000, but claimed they were salary payments. He also claimed he had infused almost $60,000 in cash to Bright Beginnings to keep it operational, which "effectively returned" any sums he took from the company.

Second, Labrado acknowledged having used funds from Bright Beginnings's account to pay $30,000 on his personal credit card, which Labrado maintained he also regularly used for Bright Beginnings's purchases. Out of the $30,000 in payments, he identified $14,859.39 as related to personal expenditures "for his own benefit" and claimed the remaining payments were related to "expenses incurred for the benefit of the Debtor."

Finally, in response to the allegation that Bright Beginnings had transferred $132,904.52 to Three R's, Labrado explained that the Bright Beginnings account from which the transfer was made was a "commingled" account. According to Labrado, although the account was ostensively in Bright Beginnings's name, it was "owned by [Bright Beginnings], Three R's School, and [] Labrado." Labrado explained that he regularly deposited the earnings from both Bright Beginnings

6

and Three R's into the account, then disbursed funds from the account to "pay for debt" for both entities. Labrado further claimed that after a March 2015 media-generating incident in which three children at the day care center at 601 Resler Drive were found in the center's parking lot, enrollment at the center declined, causing financial issues for Bright Beginnings. Within the following year, Labrado explained, Three R's deposited $366,536.88 into Bright Beginnings's /account to try to keep it afloat, and Bright Beginnings "paid out in transfers to Three R's School from those deposits the sum of $132,904.52." Labrado alleged Bright Beginnings therefore "effectively confiscated $233,632.36 of Three R's School's money."

### F. Scherr Legate purchases the Trustee's claims and the bankruptcy stay is lifted

On January 28, 2021, the bankruptcy court entered an order reflecting that Legarreta's attorneys, the Law Firm of Scherr Legate, purchased the Trustee's claims against Labrado and the Three R's for $27,000, which included "any and all claims and causes of action under state fraudulent transfer laws against Defendants, and any and all claims and causes of action to pierce the corporate veil of the Debtor against Defendants" (the Estate Claims). The court lifted the stay to allow Scherr Legate and/or Legarreta to pursue the Estate Claims in state court and to allow them to join Bright Beginnings as a party in any such action "to the extent necessary to fully adjudicate the Estate Claims."

The order also noted that Legarreta had filed a claim in the bankruptcy court against Bright Beginnings (the Legarreta Claim) based on her previously filed state-court petition seeking compensation for her injuries. The court recognized that it did not have jurisdiction to adjudicate this claim, but it lifted the bankruptcy stay to allow Legarreta to pursue her claim in the state court where she had filed suit.

In its supplemental order, the court further stated that Labrado, as the sole equity owner

7

and manager of the Debtor, was "authorized to represent, defend and act on behalf of the Debtor" in state court with respect to both the Legarreta Claim and the Estate Claims.

### G. Bright Beginnings's plea in intervention

Shortly thereafter, Scherr Legate filed "El Paso Bright Beginning's Plea in Intervention for Fraudulent Transfers, Avoidance of Transfers, Pierce Corporate Veil and Constructive Trust" in Legarreta's pending state court suits to pursue the Estate Claims as permitted by the bankruptcy court. Bright Beginnings sought to "avoid and recover" the allegedly fraudulent transfers it "made or caused to be made to or for the benefit of Labrado," listing the same three transfers identified by the Bankruptcy Trustee. In addition, Bright Beginnings brought a claim for "piercing the corporate veil," alleging "the identity of [] Labrado, Three R's School, EPBB (Bright Beginnings), 601 Resler LLC, and [] Labrado's related parties are in substance one and the same" and "are but the alter egos of each other, acting solely as a conduit for the performance of each other's business and benefit." Bright Beginnings sought to hold the defendants "jointly and severally liable for Intervenor's damages under the theories of piercing the corporate veil, alter ego, principal/agent, master/servant."

### H. The consolidation of all claims

Legarreta thereafter moved to consolidate her two lawsuits and transfer both proceedings to district court. The trial court granted the order in June 2021, and all proceedings went forward in the district court in Cause No. 2016DCV0016.

### I. The death penalty sanctions on the issue of liability

Legarreta began serving discovery requests on the various defendants in both lawsuits on May 1, 2021. Believing the defendants were not adequately responding, she filed four motions to compel discovery, beginning on July 14, 2021, and ending over a year later, on September 29,

2022. Legarreta also moved to hold the defendants in contempt for their failure to respond to her discovery requests and for sanctions. The trial court issued repeated orders compelling the defendants to respond to Legarreta's discovery requests. In December 2015, the court found that the defendants had failed to comply with its orders and granted Legarreta's request for "death penalty sanctions." The court ruled that it would order a "directed verdict" at trial on liability, finding that whichever defendant the jury determined was Legarreta's employer would be held liable for her injuries. It further ruled that the jury would be responsible for determining the amount of her damages and the issue of corporate veil piercing. The court declined to hold the defendants in contempt, instead ordering them to pay $17,730 in attorneys' fees and legal expenses, to be included as part of the Final Judgment.

## J. Trial on damages

The trial court divided the trial into two phases. During the first phase, which centered on damages, Legarreta, her surgeon, and her son testified regarding the extent of her injuries, her ongoing pain and suffering, and the limitations on her everyday life and her employment opportunities. Based on this evidence, the jury found that she suffered damages in the amount of $87,992.

## K. Trial on piercing the corporate veil and the claims for fraudulent transfers

During the second phase of trial, only Labrado testified. He testified he was the sole and managing member and "primary decision maker" of Bright Beginnings, which operated the day care center located at 601 Resler Drive in west El Paso where Legaretta had been employed. Labrado testified he was also the managing member of the other two LLCs named in Legarreta's lawsuit: 601 Resler LLC, which held the property at that location, and Three R's, which operated a different day care center in east El Paso. However, he testified that the fourth defendant,

9

Dimensions, was his mother's corporation through which she independently operated her day care center and which was not involved in any of his businesses.

### (1) Legarreta's claims against Dimension

Labrado denied Legarreta's claim that Dimensions was her employer and that Dimensions had fraudulently transferred its interest in the building to 601 Resler, LLC shortly after her accident. Labrado testified that Bright Beginnings was Legarreta's sole employer and that the transfer of the building was unrelated to her work injuries. He explained that although Dimensions took out a loan to purchase the building when he first established the center due to his lack of credit, Dimensions later transferred the property to 601 Resler, LLC, which he created to "hold" the property after the LLC took out a loan in the amount of $230,000 to pay off Dimensions's loan. Labrado explained that he began the loan process in the fall of 2014 before Legarreta's injury and that the loan "closed" in January 2015, even though the property was not transferred to 601 Resler, LLC until April 2015. When opposing counsel noted that the $230,000 loan amount was less than Dimensions owed on the building and asked Labrado if he had "pocketed" the remaining $19,321.83, Labrado objected to the phrasing of the question but did not deny keeping the funds.

Although Labrado asserted 601 Resler, LLC was the sole building owner following the transfer, Legarreta presented evidence that Bright Beginnings did not pay 601 Resler, LLC rent on the building in 2014, and only paid $37,800 in rent in 2015. But in 2017, the year before Bright Beginnings filed for bankruptcy, it paid 601 Resler, LLC $77,400 in rent. In addition, Legaretta presented evidence that Bright Beginnings purchased property insurance on the building in September 2017, listing itself as the insured.

### (2) Labrado's testimony relating to the Bankruptcy Trustee's TUFTA complaint

On cross-examination, Legarreta's attorneys reviewed with Labrado his responses to the

Bankruptcy Trustee's complaint regarding the allegedly fraudulently transfers Bright Beginnings made to him and Three R's in the year before he filed bankruptcy, and Labrado did not seek to alter any of his responses. Again, he acknowledged maintaining a "commingled" or "consolidated" bank account, which was "nominally" in Bright Beginnings's name. Consistent with his responses, he did not deny that he, Bright Beginnings, and Three R's all used the commingled account. Labrado explained that he deposited earnings from both entities into the account and disbursed funds from the account to pay both entities' debts.

Labrado also recounted the incident where children were found in the day care center's parking lot to explain Bright Beginnings's decreased enrollment and his infusion of $59,151.12 of to try to keep Bright Beginnings operational, as well as why he deposited $233,632.36 in funds from the operation of Three R's to Bright Beginnings as a loan. Labrado stated that neither he nor Three R's were ever reimbursed for those amounts, which is why he listed himself and Three R's as creditors in Bright Beginnings's bankruptcy proceedings. He also explained that he listed Dozal, his then-girlfriend who was previously employed at the Three R's School, as a creditor in the bankruptcy proceedings because she had uncashed checks for work she had performed at the 601 Resler location.

Labrado also acknowledged having used funds from Bright Beginnings's bank account to make $30,000 in personal credit card payments. Again, he claimed to have used his personal credit card to make purchases for both of his day care centers. However, he admitted that $14,859.39 of the $30,000 payment related to his own personal expenses and stated that he was aware he had to reimburse that amount and intended to do so at the end of the year. When asked why he did not pay the personal expenses "out of [his] pocket," rather than wait until the end of the year to pay back the account, he replied "That's not how we did things."

11

### (3)  Discrepancies in Bright Beginnings's balance sheets and bankruptcy filings

At trial, Legarreta also argued that Bright Beginnings transferred other assets prior to declaring bankruptcy to avoid her claim without specifying to whom they were transferred. In support, she presented copies of Bright Beginnings's balance sheets prepared by its accountant for tax purposes at the end of 2016 and 2017, contrasting them with the April 2018 balance sheet its account prepared the month before it declared bankruptcy. In its 2016 and 2017 balance sheets, which Labrado admitted he approved, the balance sheets showed that Bright Beginnings had assets totaling $320,822.95 and $305,467.08, respectively.[4] But in its April 30, 2018 balance sheet, which Labrado also approved, Bright Beginnings listed its total assets at only $30,785.66. And in its bankruptcy petition, filed three days earlier, Bright Beginnings asserted it only had $11,234.77 in assets.

In seeking to determine the reason for the discrepancies, Legarreta's attorneys questioned Labrado about a $231,173.40 note receivable from "601" that was listed as an asset in the December 2016 and December 2017 balance sheets, but which was absent from the April 2018 balance sheet and the bankruptcy filing. Labrado admitted the earlier balance sheets listed the note as an "asset" and later filings did not. He also acknowledged that Bright Beginnings relied on the balance sheets to file its taxes, but he proclaimed to be unaware of what the note was for or why it was not listed in the later filings. In particular, the following colloquy occurred relative to this asset:

> Q.  So is this the note receivable potential --possibly for the property and real estate at 601 Resler in the amount of $231,173.40?

---

[4]  Legarreta introduced evidence stating Bright Beginnings had $3,900,271.33 in assets as of December 2017 on an "accrual basis." Labrado admitted the balance sheet reflected that amount but said he believed the figure was inaccurate. Yet another balance sheet dated December 2017 showed Bright Beginnings's assets as $268,816.08. Labrado did not explain the discrepancies in the various balance sheets at trial, other than to testify that the balance sheets may not have reflected final figures.

A. I don't know.

Q. These are your financial records based on information provided by you to your accountant, correct?

A. I understand that, but it's a balance sheet. And I'm not sure exactly what note receivable means as another asset. I'm not an accountant. I don't know that.

When later asked if the note receivable had "disappeared" or why it was no longer listed as an asset on the April 2018 balance sheet or in the bankruptcy filings, Labrado was unable to explain why, claiming that his accountant may have made the decision to do so for unknown reasons

Labrado was also asked why the 2016 and 2017 balance sheets listed vehicles as assets belonging to Bright Beginnings ($169,619.79 in 2017 and $158,619.79 in 2016) while no vehicles were listed in either the 2018 balance sheet or in the bankruptcy filing.[5] Labrado explained he had purchased two trucks in his name using funds from his personal bank account as a downpayment but that Bright Beginnings had been making the monthly payments on them. He acknowledged having listed the vehicles as belonging to Bright Beginnings so it could claim the depreciation, even though the titles remained in his name at all times, noting the trucks were "primarily" used for business purposes for the two day care centers. He admitted, however, that he used one of the trucks for personal use as well and allowed Dozal to use the other one. Labrado contended, as he did in his bankruptcy court response, that Bright Beginnings "transferred" the two trucks to Three R's shortly before filing for bankruptcy so Three R's School could take over the payments, as Bright Beginnings could no longer pay, but he did not put title to the trucks in the company's name.

---

[5] In another balance sheet dated December 31, 2017, the vehicles owned by Bright Beginnings were valued at $99,869.79.

13

Labrado also acknowledged that, even though the day care center needed buses and other vehicles to pick up children for after school care, and the center "would have had those" in 2018, no other vehicles were listed on Bright Beginnings's 2018 balance sheets or in its bankruptcy filing.

In closing, Legarreta's attorneys argued to the jury, among other things, that Labrado had used Bright Beginnings as his alter ego and perpetrated an actual fraud on Legaretta by engaging in actions to ensure that Bright Beginnings was judgment-proof to avoid liability on her claim.

## I.    The final judgment

The trial court's final judgment listed questions answered by the jury during its deliberations. In its answer to Question One, the jury identified Bright Beginnings as Legarreta's only employer at the time she sustained her injuries. Based on its answer to Question Two, the trial court found that Legarreta suffered $87,992 in damages related to her accident while she was employed with Bright Beginnings.

As discussed in more detail below, Question Three encompassed the veil piercing issue. It asked whether Labrado, Dimensions, or Three R's could be held responsible for Bright Beginnings's conduct, i.e., whether Bright Beginnings was "organized and operated as [their] mere tool or business conduit" and whether Bright Beginnings perpetrated an actual fraud (involving dishonesty of purpose or intent to deceive in this context) on Legarreta primarily for the "direct personal benefit" of Labrado, Dimensions, and Three R's School. The jury answered in the affirmative with respect to Labrado only.

Question Four asked whether Bright Beginnings "transferred any assets" to Labrado or Three R's School "with the actual intent to hinder, delay, or defraud any creditor." Finally, Question Five asked whether Bright Beginnings transferred "any of its assets" to Labrado or Three

14

R's School "without receiving reasonably equivalent value." The jury answered both questions in the negative.

The trial court entered judgment in favor of Legarreta and awarded her damages in accordance with the jury's verdict against Bright Beginnings and Labrado, finding him "personally liable" for Bright Beginnings's obligations. Combined with the previously awarded attorneys' fees for the defendants' discovery violations, as well as prejudgment interest, the court entered a total judgment in the amount of $163,680.01 against both defendants.

### J. Post-trial motions

Following the trial court's entry of judgment, Bright Beginnings and Labrado filed a motion to disregard the jury findings, and in the alternative, a motion for judgment notwithstanding the verdict. They argued the court should enter a take-nothing judgment in Labrado's favor and ignore the jury's finding in Question Three on the corporate veil-piercing issues, as there was no evidence of "actual fraud." Bright Beginnings and Labrado also filed a motion for new trial, similarly arguing that there was factually insufficient evidence to establish actual fraud. The trial court denied both motions.

Labrado appealed the trial court's finding that he could be held personally liable for Legarreta's injuries.

## II. ISSUE ON APPEAL

Labrado raises one issue on appeal, contending the evidence at trial was legally and/or factually insufficient to support the jury's finding in Question No. 3 that he could be liable under an alter ego theory for the obligations of Bright Beginnings. In particular, he argues Legarreta failed to establish that he committed actual fraud for his own direct benefit. For the following reasons, we disagree.

15

# III. APPLICABLE LAW

As the Texas Supreme Court recently reiterated, "[u]nder longstanding Texas common law, corporate shareholders, officers, and directors are generally shielded from liability for corporate obligations." *Keyes v. Weller*, 692 S.W.3d 274, 278 (Tex. 2024) (citing *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006)). In more recent history, subsection (a)(2) and (3) of § 21.233 of the Texas Business and Organizations Code codified that:

> A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder . . . or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or [] any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality[.]

Tex. Bus. Orgs. Code Ann. § 21.223(a)(2), (3).

However, subsection (a)(2) does not shield those individuals from liability "if the obligee demonstrates that [they] caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate" of such. Tex. Bus. Orgs. Code Ann. § 21.223(b). "The liability of a holder, beneficial owner, or subscriber of shares of a corporation, or any affiliate of such a holder, owner, or subscriber or of the corporation, for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Tex. Bus. Orgs. Code Ann. § 21.224; *see also Keyes*, 692 S.W.3d at 278 (recognizing that "Section 21.224 confirms that liability for an obligation limited by Section 21.223 is 'exclusive and preempts any other liability imposed for that obligation under common law or otherwise'"). Although § 21.223 refers only to corporations, "[b]oth the restriction on

16

individual liability and the exception to it likewise apply to limited liability companies." *See Plan B Holdings, LLC v. RSLLP*, 681 S.W.3d 443, 458 (Tex. App.—Austin 2023, no pet.) (citing Tex. Bus. Orgs. Code Ann. § 101.002(a) ("Subject to Section 101.114, Section[] 21.223 . . . appl[ies] to a limited liability company and the company's members, owners, assignees, affiliates, and subscribers.")); *see also Chico Auto Parts & Serv., Inc. v. Crockett*, 512 S.W.3d 560, 571 & n.6 (Tex. App.—El Paso 2017, pet. denied) (recognizing same).[6]

Courts have generally interpreted the Code requirements as two-fold. First, the plaintiff must show "(1) that the persons or entities on whom he seeks to impose liability are alter egos of the [corporation], and (2) that the corporate fiction was used for an illegitimate purpose," i.e., used to perpetrate an actual fraud for the person or entities' benefit, in satisfaction of the requirements of § 21.223(a) and (b). *See Tryco Enterprises, Inc. v. Robinson*, 390 S.W.3d 497, 508–11 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd). The plaintiff shoulders the burden to demonstrate "both prongs of the test." *Id.* at 508; *see also Cass v. Stephens*, 156 S.W.3d 38, 59 (Tex. App.—El Paso 2004, pet. denied) (recognizing that it is the obligee's burden to establish that

---

[6] We note that "[w]hether a plaintiff may pierce an entity's veil pursuant to either the alter ego theory or the sham to perpetrate a fraud theory depends on whether the plaintiff's claims sound in tort or contract." *AHBP LLC v. Lynd Co.*, 649 F.Supp.3d 371, 385–86 (W.D. Tex. 2023) (citing *Ogbonna v. USPLabs, LLC*, No. EP-13-CV-347-KC, 2014 WL 2592097, at *8 (W.D. Tex. June 10, 2014)). Though a tort claimant may pierce the veil under either theory, a contract claimant may only pierce the veil if the defendant has also committed an actual fraud against the plaintiff for the defendant's direct personal benefit. *Id.* (citing Tex. Bus. Orgs. Code Ann. § 21.223(b)); *see also Keyes v. Weller*, 692 S.W.3d 274, 280 (Tex. 2024). Legarreta characterized her claim for personal injuries as a tort claim for the defendants' failure to provide her with a safe workplace, but we must address the law pertaining to contract-based claims because the charge required the jury to determine whether Labrado used the corporation to perpetrate an actual fraud on Legarreta for his own personal benefit to pierce the corporate veil. The parties do not challenge the propriety of the jury charge on appeal, and therefore we must examine the sufficiency of the evidence under the charge as given. *See Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 407 (Tex. 2016) ("Even if another legal theory was argued to the jury and explained by the lawyers in argument, we are bound by the instructions given to the jury . . . ."); *Janssen Pharmaceutica, Inc. v. Martinez*, 296 S.W.3d 634, 644 (Tex. App.—El Paso 2009, no pet.), *as corrected* (Oct. 1, 2012) (recognizing that "[w]hen reviewing a sufficiency of the evidence challenge, an appellate court is to rule on the question and instruction actually submitted to the jury, rather than the instruction that should have been submitted to the jury," where the parties do not "challenge the jury charge on appeal").

the corporate entity perpetrated an actual fraud on him for the shareholder or affiliate's own direct benefit).

## IV. STANDARD OF REVIEW

As we have previously recognized, "[l]egal and factual sufficiency arguments both challenge the sufficiency of the evidence to support determinations by the fact finder; but each invoke a different standard of review." *Cox Paving of Texas, Inc. v. H.O. Salinas & Sons Paving, Inc.*, 657 S.W.3d 756, 768 (Tex. App.—El Paso 2022, pet. denied).

"When reviewing a legal-sufficiency challenge to a jury verdict, we view all evidence in the light most favorable to the verdict." *Albert v. Fort Worth & W. R.R. Co.*, 690 S.W.3d 92, 97 (Tex. 2024). "We credit favorable evidence if a reasonable juror could do so and disregard contrary evidence unless a reasonable juror could not." *Id.* We "indulge every reasonable inference that the evidence supports"; we will only reverse a jury finding if the evidence allows for only one inference and the jury's finding "runs contrary to that inference." *Id.* Accordingly, we will only "overturn a judgment on a jury verdict on legal-sufficiency grounds if there is a complete absence of evidence proving a vital fact, the rules of law or evidence bar the court from weighing the only evidence proving a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively disproves the existence of a vital fact." *Id.* "More than a mere scintilla of evidence exists to prove a vital fact, making reversal on legal-sufficiency grounds improper when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (the test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review"). On the other hand, if the evidence is so weak that it only creates a "mere surmise or suspicion" of the existence of a vital fact, "it is regarded as no

18

evidence." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

"When a party challenges the factual sufficiency of the evidence, it concedes that conflicting evidence was presented at trial, but argues that the evidence against a finding or judgment is 'so great' that to find the opposite was erroneous." *Cox Paving of Texas*, 657 S.W.3d at 768–69. A factual sufficiency challenges requires a court of appeal "to weigh all the evidence." *Id*. A factual sufficiency challenge is sustained only when the evidence supporting the finding is so weak "as to be clearly wrong and unjust," or when the finding is "manifestly unjust," "shock[s] the conscience," or "clearly demonstrate[s] bias." *Id*.

In applying either standard, we remain mindful that the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.* (citing *In re Estate of Scott*, 601 S.W.3d 77, 88 (Tex. App.—El Paso 2020, no pet.)). "The trier of fact may choose to believe one witness and disbelieve another, and resolve conflicts, and we must not impose our opinion to the contrary, if the trier of fact's resolution 'falls within [the] zone of reasonable disagreement.'" *Id*. at 768–69.

In reviewing the sufficiency of evidence, "[o]ur review is restricted to the jury charge as submitted when there was no objection to the instruction." *Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 407 (Tex. 2016). "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Id*.; *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 713 (Tex. 2016) (recognizing that the court reviews the sufficiency of the evidence "against the factors submitted in the charge to determine whether evidence supports both the existence of damages and the amount awarded").

19

# V. ANALYSIS

With respect to Legarreta's veil-piercing claim, the trial court instructed the jury as follows:

[Are] one or more of the following responsible for the conduct of El Paso Bright Beginnings, LLC?

A person or entity is "responsible" for the conduct of El Paso Bright Beginnings, LLC if:

El Paso Bright Beginnings, LLC was organized and operated as a mere tool or business conduit of Laboe Labrado, Dimensions In Education, Inc., and Three R's School, LLC; there was such unity between El Paso Bright Beginnings, LLC, Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC that the separateness of El Paso Bright Beginnings, LLC had ceased; and did perpetrate an actual fraud on Aurora Legarreta primarily for the direct personal benefit of Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC.

"Actual Fraud" refers in the context of piercing the corporate veil as involving dishonesty of purpose or intent to deceive.

In deciding whether there was such unity between El Paso Bright Beginnings, LLC and Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC below that the separateness of El Paso Bright Beginnings, LLC had ceased, you are to consider the total dealings of El Paso Bright Beginnings, LLC and Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC, including:

1. The degree to which El Paso Bright Beginnings, LLC's property had been kept separate from Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC;

2. The amount of financial interest, ownership, and control Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC listed maintained over El Paso Bright Beginnings, LLC; and

3. Whether El Paso Bright Beginnings, LLC had been used for personal purposes of Laboe Labrado, Dimensions In Education, Inc. and Three R's School[], LLC;

OR

4. El Paso Bright Beginnings, LLC used Laboe Labrado, Dimensions In Education, Inc. and Three R's School, LLC as a means of evading an existing legal obligation for the purpose of perpetrating and did perpetrate an actual fraud on Aurora Legarreta primarily for the direct personal benefit of El Paso Bright Beginnings, LLC.

20

The jury answered:

1. Laboe Labrado      Yes
2. Dimensions in Education, Inc.    No
3. Three R's School, LLC      No[7]

Labrado argues that the jury's answer was not supported by sufficient evidence to establish: (1) either that Bright Beginnings was organized and operated as a mere tool or business conduit of Labrado or that there was such unity between Labrado and Bright Beginnings that its separateness had ceased; or (2) that he perpetrated an actual fraud on Legarreta primarily for his direct personal benefit. We address each argument separately.

### (1) The alter ego analysis

Labrado notes that Legarreta had the burden to establish that "there [was] such unity between [] Labrado and [] Bright Beginnings [] that the separateness of the single corporation has ceased," citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990). And he maintains Legarreta failed to meet her burden, asserting "[t]he evidence does not support any combined bank accounts between [] Labrado and [] Bright Beginnings []." According to Labrado, "[t]he evidence was clear that [he] had his own personal account," and "[t]he fact that Bright Beginnings and Three R's School had the same bank account is irrelevant." In other words, Labrado appears to believe that because he testified to using a "personal" bank account to make a downpayment on the trucks he and Dozal drove, this is sufficient for us to disregard the jury's finding on the question of unity. We disagree.

The Texas Supreme Court has recognized that a corporation and an individual may be viewed as alter egos based on the "total dealings of the corporation and the individual . . .

---

[7]Names appear in all capital letters in original.

include[ing] evidence of the degree to which . . . corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Mancorp*, 802 S.W.2d at 228 (internal quotation marks omitted); *Penhollow Custom Homes v. Kim*, 320 S.W.3d 366, 373 (Tex. App.—El Paso 2010, no pet.) (recognizing same). As proof of alter ego, a factfinder "may consider: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate." *Penhollow Custom Homes, LLC*, 320 S.W.3d at 372–73. However, under § 21.223(a)(3), the failure of a corporation to observe any corporate formality is no longer a factor in considering whether alter ego exists. *Id.* (citing Tex. Bus. Orgs. Code Ann. § 21.223(a)(3)).

We agree with Legarreta that the record supports the existence of at least two of the four factors the trial court instructed the jury it could consider in determining whether there was sufficient unity between Bright Beginnings and Labrado such that their separateness ceased.

The first factor was the degree to which Bright Beginnings's "property had been kept separate" from Labrado. Ample evidence supports a finding that their property was not kept separate. Though he also had a personal account, Labrado admitted maintaining a "commingled" bank account that he, Bright Beginnings, and Three R's jointly "owned." At trial, he did not deny that all three used the account. In addition, Labrado acknowledged depositing earnings into the commingled account from both LLCs, which he owned and maintained exclusive control over, and using the commingled account to pay debts for both entities. *See Plan B Holdings*, 681 S.W.3d at 462 (concluding that more than a scintilla of evidence existed that defendant, who was the sole

owner of two companies over which she maintained exclusive control, and her two companies were alter egos, where she commonly shifted money from one business to another); *see also Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 482–84 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that defendant, his wholly owned holding company, and its majority owned subsidiary were alter egos for jurisdictional purposes when evidence showed commingling of funds, defendant's payment of corporate debts with personal checks, diversion of company profits, and inadequate capitalization).

Labrado also acknowledged using a personal credit card for both day care centers' expenses as well as his own personal use. In particular, he admitted using funds from the Bright Beginnings "commingled" account to pay almost $15,000 in personal charges on his credit card. *See Carter v. JEB Lease Serv., Inc.*, No. 10-02-034-CV, 2004 WL 229536, at *4 (Tex. App.—Waco Feb. 4, 2004, no pet.) (mem. op.) (finding more than a scintilla of evidence that the corporation was an alter ego of the shareholders where shareholders transferred assets belonging to corporation to pay a personal debt). While Labrado claimed he intended to repay the account for his personal expenses at the end of the year, the jury could have disbelieved this testimony, as its role includes assessing credibility.

In addition, Labrado acknowledged having used personal funds for the downpayments on the trucks he and Dozal used for personal and business purposes and having kept the titles in his name even though Bright Beginnings made the monthly payments and listed them as assets on its 2016 and 2017 balance sheets. Labrado also acknowledged later transferring the trucks to Three R's, another entity in which he was the sole owner, shortly before Bright Beginnings declared bankruptcy to allow Three R's to make the payments, all the while retaining title to the trucks himself.

23

The second factor the jury was told it could consider was the "amount of financial interest, ownership, and control" Labrado maintained over Bright Beginnings. At trial, Labrado testified to being the representative and sole manager and member of Bright Beginnings; he never disputed that he had full ownership and control of Bright Beginnings. His financial interest in the business was reflected in the fact that he started the company, drew a salary from it, and was motivated to infuse significant amounts of money into the business to keep it afloat after it suffered decreased enrollment.

We agree with Legarreta that the evidence was sufficient to support a finding that Labrado organized and operated Bright Beginnings as a mere conduit or tool, and that there was such unity between the two that their separateness had ceased. Labrado, however, argues that even if the evidence supported a finding that he used Bright Beginnings as his alter ego, there was insufficient evidence to establish the second prong in the analysis—whether he used Bright Beginnings to perpetrate an actual fraud on Legaretta primarily for his direct benefit. We address that question next.

### (2)  Evidence that Labrado perpetrated an actual fraud for his direct benefit

While "actual fraud" is not statutorily defined, for purposes of corporate veil-piercing, actual fraud should be construed as the trial court did in the jury charge in this case—as involving "dishonesty of purpose or intent to deceive." *See R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc.*, 578 S.W.3d 218, 231 (Tex. App.—El Paso 2019, no pet.) (citing *U.S. KingKing, LLC v. Precision Energy Services, Inc.*, 555 S.W.3d 200, 212–13 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also Plan B Holdings*, 681 S.W.3d at 458 (recognizing that in the context of piercing the corporate veil, "[a]ctual fraud usually involves dishonesty of purpose or intent to deceive"). Thus, in this context, "actual fraud is not equivalent to the tort of fraud." *Plan*

24

*B Holdings, LLC*, 681 S.W.3d at 458–59 (citing *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.); *accord HHH Farms, L.L.C. v. Fannin Bank*, 648 S.W.3d 387, 409 (Tex. App.—Texarkana 2022, pet. denied); *Belliveau v. Barco, Inc.*, 987 F.3d 122, 129 (5th Cir. 2021)).

The question of whether a defendant acted with the requisite intent to defraud a creditor is "ordinarily a question for the jury or the court passing on the fact." *Hahn v. Love*, 321 S.W.3d 517, 525 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Flores v. Robinson Roofing & Const. Co., Inc.*, 161 S.W.3d 750, 755 (Tex. App.—Fort Worth 2005, pet. denied)). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Id.* at 525–56 (quoting *Flores*, 161 S.W.3d at 755).

In arguing there was insufficient evidence of actual fraud, Labrado points to the jury's negative answers to Questions Four and Five, which appear to have been modeled after the TUFTA claims the Bankruptcy Trustee had filed against Bright Beginnings. These questions asked the jury if Bright Beginnings had made any improper asset transfers to either Labrado or Three R's with the actual intent to hinder, delay, or defraud any creditor or for less than the asset's reasonable value.[8] But they did not ask whether Bright Beginnings fraudulently transferred assets to any other

---

[8] **Question Four asked**:

> Did El Paso Bright Beginnings, LLC transfer any assets to any of the following with actual intent to hinder, delay, or defraud any creditor?
>
> In determining actual intent, you may consider, among other factors, whether —
>
> 1. The transfer was to an insider.
> 2. The transfer was concealed.
> 3. Before the transfer was made, El Paso Bright Beginnings, LLC had been sued or threatened with suit.
> 4. The transfer was of substantially all of El Paso Bright Beginnings, LLC's assets.

entities in which Labrado had an interest.[9] Thus, the jury's answers failed to conclusively establish that Bright Beginnings did not make any fraudulent transfers prior to filing for bankruptcy that may have, at least indirectly, benefitted Labrado.

Moreover, regardless of the jury's negative answers to the fraudulent transfer questions, the jury still could have found that Labrado engaged in other conduct that satisfied the actual-fraud element of Legarreta's corporate veil-piercing theory. As our sister court has recognized, while a finding that a corporation made a fraudulent transfer in violation of TUFTA may satisfy the actual-fraud element required to pierce the corporate veil, a plaintiff is not required to establish a TUFTA violation to satisfy the actual-fraud element. *See Plan B Holdings*, 681 S.W.3d at 464. In other words, there is more than one way to establish actual fraud for veil-piercing purposes.

Here, Legarreta relied on a separate theory at trial to support her actual-fraud claim. As explained above, she presented evidence that in the two years before declaring bankruptcy, in its

---

5. The value of consideration received by El Paso Bright Beginnings, LLC was reasonably equivalent value to the value of the asset transferred.
6. El Paso Bright Beginnings, LLC was insolvent or became insolvent shortly after the transfer was made.

**The jury answered**:

1. Laboe Labrado        No
2. Three R's School, LLC    No

**Question Five asked**:

Did El Paso Bright Beginnings, LLC transfer any of its assets to one or more of the following without receiving reasonably equivalent value?

**The jury answered**:

1. Laboe Labrado        No
2. Three R's School, LLC    No

[9] As set forth above, Labrado was unable to explain what happened to the $231,000 note receivable that had been on Bright Beginnings's balance sheet prior to the bankruptcy filing. From the evidence presented, the jury could have inferred that Labrado internally shifted this asset to a balance sheet of another one of his entities. In this regard, we recognize, as did Labrado's attorney at trial, that the jury was never asked if any of Bright Beginnings's assets were transferred to 601 Resler, LLC, of which Labrado was also the sole owner and manager.

2016 and 2017 balance sheets, Bright Beginnings listed over $300,000 in assets (minus depreciation), including a note receivable for $231,173.40 and vehicles valued at approximately $160,000. But neither of these assets were listed in either Bright Beginnings's 2018 balance sheet or in its 2018 bankruptcy filing. In closing, Legarreta's attorneys argued to the jury that these assets effectively "disappeared" from the balance sheets the same month Bright Beginnings filed its bankruptcy petition, and that Labrado could not explain why the assets were not listed in the bankruptcy petition.

From this evidence, and judging Labrado's credibility, the jury could have inferred that Labrado engaged in actual fraud by manipulating Bright Beginnings's balance sheets, thereby rendering it insolvent, and then placed the company in bankruptcy as a means of avoiding its obligation to Legarreta. *See Latham*, 320 S.W.3d at 607–609 (holding that a rational juror could have found that the owners' conduct of dissolving the corporation and falsely stating that all known debts and obligations had been paid, without accounting for the customer's claim, after learning of customer's intent to sue "represented dishonesty of purpose or an intent to deceive, *i.e.*, actual fraud," to avoid the customer's claim).

However, Labrado contends that regardless of whether he used Bright Beginnings as his alter ego or otherwise engaged in any fraudulent or deceptive actions, there was insufficient evidence to support a finding that he derived a "personal benefit" from doing so. In particular, he points to his own testimony at trial that he "lost money by infusing his personal money" into Bright Beginnings to satisfy its financial obligations after its enrollment decreased and that he never recouped any of those funds before filing for bankruptcy. He therefore contends that the jury could not have found that he derived any personal benefit from his actions.

27

But the question is not whether Labrado ultimately lost money from his actions; rather, it is whether the jury could have reasonably found that Labrado's actions in manipulating Bright Beginnings's balance sheets and placing it into bankruptcy to avoid liability on Legarreta's claims were perpetrated primarily for his own personal benefit. Given the evidence that Labrado treated Bright Beginnings as his alter ego, commingled assets with his own and those of his other businesses, and had a significant financial interest in the business, the jury could have reasonably found that Labrado sought to personally benefit from sheltering Bright Beginnings from liability from Legarreta's claims by placing the company into bankruptcy. Although Labrado stood to lose the $59,000 personal loan he made to Bright Beginnings, he faced the potential for far greater loss from a judgment in Legarreta's lawsuit given the serious nature of her injuries and her ongoing pain and suffering.

We therefore conclude that a rational jury could have determined that Labrado's actions in manipulating Bright Beginnings's balance sheets to render it insolvent and judgment-proof were made primarily for his direct benefit.

## VI. CONCLUSION

Both legally and factually sufficient evidence supports the jury's finding that Labrado could be held liable for Bright Beginnings's obligation to Legarreta. Labrado's sole issue on appeal is overruled.

We affirm the trial court's judgment.

LISA J. SOTO, Justice

May 30, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

28